UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
                                           :

BISHOP WILLIAM B. CARACTOR       :
                 Plaintiff,     :
                                       :    11 Civ. 2990 (DLC)
      -v-                     :
                                       :    <u>OPINION AND ORDER</u>
CITY OF NEW YORK DEPARTMENT OF   :
HOMELESS SERVICES AND SETH DIAMOND  :
                 Defendants.   :
                                       :
-------------------------------------------X

APPEARANCES:

For the plaintiff:
Bishop William B. Caractor, proceeding <u>pro se</u>
147-41 Hook Crook Boulevard
Apt. # 1F
Rosedale, New York 11422

For the defendants:
Janice Casey Silverberg
New York City Law Department, Office of the Corporation Counsel
100 Church Street
New York, New York 10007


DENISE COTE, District Judge:

    Plaintiff Bishop William B. Caractor ("Caractor"),

proceeding <u>pro se</u>, brings this action pursuant to 42 U.S.C. §

1983 against the City of New York Department of Homeless

Services ("DHS") and Seth Diamond ("Diamond"), the Commissioner

of DHS, for violations of his constitutional rights to free

speech, free exercise of religion, and equal protection.  DHS

has denied Caractor's request, on behalf of his church --

Discovered Being Ministry, Inc. ("Discovered Being Ministry" or

1

"Ministry") -- to conduct religious services inside homeless shelters.  For the following reasons, the defendants' motion for summary judgment is granted.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiff.  The plaintiff is a Bishop ordained by the African Methodist Episcopal Church.  He is also the Presiding Prelate of Discovered Being Ministry, a nonprofit organization offering religious services.  As Presiding Prelate, the plaintiff oversees eighteen churches and nine bishops in four ecclesiastical districts.  The plaintiff has conducted religious services in churches in New York, New Jersey, and South Carolina.  His religious services typically include a call to worship, prayer, a sermon, and -- on the first Sunday of each month -- communion.  During Caractor's worship services, collections are traditionally taken for the Discovered Being Ministry.

Through its family services program, defendant DHS provides emergency shelter for approximately 33,000 individuals on a daily basis in 147 shelters.  The Assistant Commissioner for Family Services, Julia Moten, explains that the program seeks to "prevent homelessness in the first place, offer safe and secure emergency housing when necessary, minimize families' length of

stay in DHS shelters, and engage clients in working toward
permanent housing."  Consistent with these goals, DHS shelters
are not intended to serve as permanent homes for DHS clients.

Since 2004, Caractor and his family have resided
intermittently in roughly four DHS shelters.  Between March and
December of 2007, he and his family resided in the LIFE shelter,
located at 78 Catherine Street in Manhattan.  According to the
plaintiff, while residing at LIFE, he observed a "rap for Jesus"
concert conducted by Donnie McClurkin of Perfecting Faith
Ministries and Creflo Dollar of Creflo Dollar Ministries.[1]  Also
during this time, Caractor requested permission to conduct
religious services at the LIFE shelter.  DHS denied his request
and Caractor filed a law suit alleging violations of his
constitutional rights.  See <u>Caractor v. NYC Dep't of Homeless</u>
<u>Servs., et al.</u>, 07 Civ. 8069 (AKH).  This case ended in 2008
when the parties reached a settlement agreement.

In 2009, DHS revised the access procedure applicable to its
shelters.  New York City DHS Access Procedure No. 10-210
("Procedure") differs from the previous version in a number of
respects.  In particular, unlike its predecessor, the revised
Procedure expressly limits access to facilities in the DHS

---

[1] During his deposition, Caractor testified that he personally
attended religious services at 78 Catherine Street on only one
occasion.  Alexis Molina, the Executive Director of the LIFE
shelter, claims that no such services took place.

shelter system to authorized visitors.  The Procedure lists categories of visitors who are authorized to enter DHS shelters, such as elected officials, legal representatives of shelter clients, and law enforcement personnel.  Relevant to the present case, the Procedure also grants access to "[s]taff members of external organizations enlisted and approved by DHS to provide onsite, shelter-related services specifically authorized or mandated by applicable laws or regulations including workers performing improvements or repair work to a facility."[2]  Under the policy, DHS "may authorize" external organizations to provide services to residents in the shelters "when DHS determines that such organizations have the specific expertise to most efficiently assist DHS in carrying out its core mission of providing shelter and assisting residents in their search for permanent housing."  The policy further provides that the facility directors have "discretion" to permit external organizations to enter the shelters to offer services mandated or authorized by law.  Approved organizations have offered services such as job-training, child-care, and certain recreational programs for children.  According to the

---

[2] The other categories of authorized visitors are (1) press/media representatives; (2) non-legal shelter client representatives; (3) inspectors from the Office of Temporary and Disability Assistance; (4) Emergency Medical Services; (5) judges, court personnel and court-appointed monitors; (6) City lawyers and senior City officials; and (7) personal visitors of individual clients.

defendants, DHS is aware of no requests by groups or individuals, other than the plaintiff, to offer religious services in DHS shelters.

In January 2010, Caractor began residing at HELP1, a DHS shelter located in Brooklyn.  Shortly after arriving at HELP1, Caractor requested permission on behalf of Discovered Being Ministry to conduct "church services" at the facility.  On February 19, 2010, Aaron Goodman, then Senior Counsel for the DHS Family Programs, sent the following letter to Caractor denying his request:

> Dear Bishop Caractor,
>
> This is in response to your correspondence of February 6, 2010, requesting permission for Discovered Being Ministry Incorporated to hold church services within the New York City Department of Homeless Services' (DHS) HELP I temporary housing facility.  For the reasons below, your request is denied.
>
> DHS' Facility Access Procedure, dated October 20, 2009 (and attached to this letter), details measures the agency has adopted to "maintain the confidentiality of clients and applicants, and to ensure that the resources within the DHS shelter system are used solely to further DHS' core mission of providing [temporary housing assistance] and housing placement to those in need."  DHS meets these required goals by restricting access to its facilities to those organizations described in the policy, and excluding all others. . . . Only those external organizations enlisted by DHS to assist it in furthering its core, statutory mission (e.g., childcare and job training services) are permitted access to use DHS facilities to provide services to DHS clients.  Because Discovered Being Ministry does not fall within the parameters of DHS' Facility Access Procedure, it cannot use DHS facilities to carry out its activities.

> This decision does not contravene the court order that
> you describe in your correspondence, which declines to
> grant the City of New York's motion to dismiss an
> earlier action brought by you against DHS.
>
> Sincerely,
>
> Aaron C. Goodman

After receiving the letter, on May 12, Caractor sent an email to
DHS Commissioner Diamond, requesting a meeting to discuss DHS's
position on bringing Christian services to DHS clients in the
shelters.  He received no response to his inquiry.

The plaintiff initiated this action on April 25, 2011, on
behalf of himself and Discovered Being Ministry.  In his
complaint, the plaintiff named DHS, Diamond, HELP1 USA and
Evelyn Zambrana ("Zambrana"), the Director of HELP1 USA, as
defendants.  On November 22, 2011, the motion to dismiss filed
by defendants HELP1 USA and Zambrana was granted.  In addition,
on December 21, the claims brought on behalf of Discovered Being
Ministry were dismissed because no attorney had filed a notice
of appearance on its behalf.  The remaining defendants filed a
motion for summary judgment.


DISCUSSION

Although the defendants do not raise the issue, the Court
must address whether the plaintiff has standing to bring this
action.  The standing inquiry, which "focuses on whether the

6

plaintiff is the proper party to bring [the] suit," will "often turn[] on the nature and source of the claim asserted."  <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997) (citation omitted).  The standing requirement has both constitutional and prudential components.  See <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975). As a constitutional matter,

> [t]he plaintiff must have suffered an "injury in fact"
> -- an invasion of a legally protected interest which
> is (a) concrete and particularized, and (b) "actual or
> imminent," not "conjectural" or "hypothetical."
> Second, there must be a causal connection between the
> injury and the conduct complained of -- the injury has
> to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent
> action of some third party not before the court.
> Third it must be likely, as opposed to merely
> "speculative" that the injury will be redressed by a
> favorable decision.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (citation omitted).  In addition, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  <u>Warth</u>, 422 U.S. at 499.  A plaintiff may, however, assert the legal rights of a third party when, in addition to satisfying the constitutional standing requirements, he demonstrates that (1) he has "a 'close' relationship with the person who possesses the right" and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests."  <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 130 (2004) (citation omitted).

Organizations, like individuals, enjoy rights to free speech, free exercise, and equal protection of the laws.  See Grosjean v. American Press Co., 297 U.S. 233, 244 (1936); Irish Lesbian and Gay Organization v. Guiliani, 143 F.3d 638, 643 (2d Cir. 1996).  When an organization itself suffers an injury, the organization has standing to seek judicial relief.  Warth, 422 U.S. at 511.  Organizations, however, must be represented in federal court by a licensed attorney.  They cannot be represented by a nonlawyer, nor can they proceed pro se.  See Lattanzio v. COMTA, 481 F.3d 137, 139-40 (2d Cir. 2007).

In the present action, after being given notice of this requirement and opportunity to seek counsel, the claims presented by Discovered Being Ministry were dismissed when no attorney filed a notice of appearance on its behalf.  In consequence, the only remaining plaintiff in this case is Caractor -- the Presiding Prelate of Discovered Being Ministry. Although Caractor is entitled to assert his own claims, he may not raise his church's claims unless the requirements of third-party standing are satisfied.  Because of this distinction, it is necessary to discern whose rights were allegedly violated by the defendants' conduct.

The plaintiff appears to be asserting the rights of Discovered Being Ministry rather than his individual rights.  It is undisputed that the request that Discovered Being Ministry be

permitted to offer church services in DHS shelters stands at the core of this dispute.  A DHS representative responded, expressly denying permission to Discovered Being Ministry to offer such services in the shelters.  The responsive letter cited DHS's Procedure, which speaks to the ability of "external organizations" to provide services in DHS facilities.  If rights were violated by this course of events, they would appear to be, first and foremost, the rights of Discovered Being Ministry, not of Caractor himself.  No allegation has been made, for instance, that Caractor made a request to <u>individually</u> be permitted to give sermons in DHS shelters.  Nor is there any allegation that DHS restricts the ability of shelter residents to engage in religious expression in the shelters.  Thus, to the extent the claims raised in plaintiff's complaint are properly characterized as the Ministry's claims, Caractor is not the proper party to bring those claims.[3]

On the other hand, it is also undisputed that, had Discovered Being Ministry's request been granted, Caractor himself would have performed the church services.  Caractor would have, for instance, delivered the sermons, led the prayers, and presided over communion.  DHS's policy prevents

---

[3] Caractor has not demonstrated that there are barriers preventing the Ministry from asserting its own interests.  The 28 U.S.C. § 1654 requirement that an organization be represented by an attorney does not qualify as such a barrier.

Caractor from taking those actions through Discovered Being
Ministry.  Thus a claim might be made that DHS's policy --
although directly addressing only the Ministry's activities --
also restricts Caractor's ability to perform his duties as
Presiding Prelate of the Ministry, thereby implicating
Caractor's individual constitutional rights.  Accordingly, to
the extent that the complaint can be read as asserting
Caractor's individual constitutional rights to free speech, free
exercise of religion, and equal protection of the laws, those
claims are addressed below.  See Scott v. Rosenberg, 702 F.2d
1263, 1268 (9th Cir. 1983) (pastor of church had standing to
challenge Federal Communications Commission's request for
church's records because records contained information of
pastor's donations, and request consequently implicated pastor's
own First Amendment rights).

       Summary judgment may not be granted for the defendants,
however, unless all of the submissions taken together "show[]
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a).  The moving party bears the burden of
demonstrating the absence of a material factual question, and in
making this determination, the court must view all facts in the
light most favorable to the non-moving party.  Eastman Kodak Co.

10

v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992);

Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed.R.Civ.P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering the summary judgment motion, the court liberally construes all submissions by the pro se plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted). The application of this forgiving standard for pro se litigants, however, "does not relieve plaintiff of his duty to meet the

requirements necessary to defeat a motion for summary judgment."
Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)
(citation omitted).

To sustain claims under 42 U.S.C. § 1983, the plaintiff
must show that he was "deprived of rights, privileges, or
immunities secured by the Constitution and laws [of the United
States]" by a person acting under color of state law.  Burg v.
Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted); see
also Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir.
1995) ("Section 1983 is only a grant of a right of action; the
substantive right giving rise to the action must come from
another source.").  Therefore, "the first step in any § 1983
claim is to identify the specific constitutional right allegedly
infringed." Pabon v. Wright, 459 F.3d 241, 252–53 (2d Cir.
2006) (citation omitted).  Liberally construed, the complaint
alleges violations of plaintiff's free speech, free exercise,
and equal protection rights.  This Opinion considers each claim
in turn.

1. Free Speech

The First Amendment of the United States Constitution
provides that "Congress shall make no law . . . abridging the
freedom of speech." U.S. Const. amend. I.  The protections of
the First Amendment are made applicable to the states through
the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S.

12

296, 303 (1940).  To determine whether government regulation
violates a plaintiff's right to free speech, courts consider (1)
whether the plaintiff is engaged in activity protected by the
First Amendment; (2) the nature of the forum in which the
government seeks to regulate speech and in which the plaintiff
seeks to speak; and (3) whether the government's reasons for the
restriction on expressive conduct satisfy the applicable
constitutional standards.  Cornelius v. NAACP Legal Defense &
Educ. Fund., 473 U.S. 788, 797 (1985).

Although the First Amendment extends its protection to
certain forms of speech or expressive activity, "[e]ven
protected speech is not equally permissible in all places and at
all times."  Id. at 799.  The level of constitutional protection
afforded to expressive activity varies in relation to the nature
of the forum in which an individual seeks to perform the
activity.  For free speech purposes, government property can be
divided into roughly four categories: (1) traditional public
fora; (2) designated public fora; (3) limited public fora; and
(4) nonpublic fora.  R.P. ex rel Ochshom v. Ithaca City School
Dist., 645 F.3d 533, 539 (2d Cir. 2011).  To determine the
proper classification of government property, courts consider
whether the government has manifested an intent to open the
property to expressive activity, as well as the physical
characteristics and purpose of the property.  See Make the Road

13

By Walking, Inc. v. Turner, 378 F.3d 133, 145-146 (2d Cir. 2004). A public forum is not created through government inaction. Instead, the government must intentionally open the forum to public expression. Cornelius, 473 U.S. at 802. As an indication of governmental intent, courts look to the government's policies, regulations, and practice. Id.

Traditional public fora are those places -- like streets and parks -- that have "traditionally been available for public expression and [have] as a principal purpose the free exchange of ideas." Hotel Emps. & Rest. Emps. Union v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 544 (2d Cir. 2002) (citation omitted). In a traditional public forum, content-based restrictions are permissible only if they "serve a compelling government interest and [are] narrowly tailored to achieve that interest." Id. at 545. Content-neutral time, place, and manner restrictions, however, are acceptable so long as they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." Id. (citation omitted).

The second category of fora -- designated public fora -- encompasses government property that has not traditionally been available for public expression, but which, by government designation, has been opened "for all types of expressive activity." Id. Although the government is not obligated to

14

create such fora, once it has chosen to open government property
to public expression, its regulation of that forum is subject to
the same scrutiny as regulation of traditional public fora.
Perry Ed. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46
(1983).

The third category of government property occupies a middle
ground between designated public fora and nonpublic fora.  The
limited public forum has been described as both a "subset of the
designated public forum" and as a "nonpublic forum" that has
been opened to expressive activity by "certain kinds of speakers
or to discussion of certain subjects."  Hotel Emps., 311 F.3d at
545 (citation omitted).  Determination of the appropriate level
of scrutiny of a regulation of speech in a limited public forum
requires attention to categories of speech or speakers for which
the forum has been made available.  On the one hand,
restrictions on speech or speakers that fall within the
categories of speech or speakers for which the space has been
designated are subject to strict scrutiny.  Id. at 545-46.  On
the other hand, restrictions on speech or speakers that fall
outside the class of speech or speakers for which the space is
designated need only be reasonable and viewpoint neutral.  Id.
at 546; see also Make the Road by Walking, 378 F.3d at 143 &
n.4.

Lastly, there are nonpublic fora, which are not open to
public expression either by tradition or designation.
Regulation of speech in such fora is permissible as long as it
is reasonable and viewpoint neutral.  Make the Road by Walking,
378 F.3d at 143.

The distinction between a limited public forum and a
nonpublic forum can be a fine one.  The Second Circuit has
elaborated on this distinction, explaining that "a policy
allowing some speakers to use a forum does not necessarily
convert a nonpublic forum into a limited public forum."  Id. at
144.  The distinction between the two types of fora reduces to
the difference between general access and selective access.  A
court examines the "written policies and actual practices" of a
government institution to determine whether an access policy is
selective or general.  Id. at 144.

It is undisputed that the religious services the plaintiff
sought to offer through his religious organization constitute
protected expression under the Free Speech Clause of the First
Amendment.  See Capitol Square Review v. Pinette, 515 U.S. 753,
760 (1995).  The parties do dispute, however, the proper
classification of the HELP1 shelter and DHS shelters in general.
The plaintiff argues that DHS has created designated public fora
by opening its shelters to religious services.  The defendants,
on the other hand, claim that DHS shelters are limited public

16

fora in which religious services have not been permitted.  The
level of scrutiny to be applied to the defendants' actions
hinges on these distinctions.

Taking the evidence in the light most favorable to the
plaintiff, DHS shelters are nonpublic fora.  DHS's Procedure
grants access on a selective, rather than general, basis.  The
selective quality of DHS's access Procedure establishes the
shelters as nonpublic fora, rather than designated public fora
or even limited public fora.  Discovered Being Ministry, the
religious organization through which plaintiff sought to offer
services, falls outside the categories of speakers who are
eligible for access to shelters under DHS's policy.[4]

---

[4] One nuance of the present action is that, on its face, the
Procedure applies only to visitors, and a visitor is defined as
"any individual who does not reside in the Facility or is not an
employee assigned to the Facility on a full-time basis."
(Emphasis supplied.)  The Ministry is reasonably viewed as a
visitor within the meaning of the Procedure.  But, although the
Procedure does not address the ability of residents to offer
religious services, DHS may have a practice of also prohibiting
such expressive activity.  Indeed, DHS appears to interpret its
policy broadly as barring all religious worship services.  DHS's
regulation of the expressive conduct of shelter residents is
not, however, squarely implicated by the present action.  Here,
the only complained of action is DHS's decision to "bar[]
Discovered Being Ministry, Incorporated" from offering church
services in DHS shelters.  The distinction between the plaintiff
and his organization is not purely a formal one as the plaintiff
has explained that -- if the Ministry were granted permission to
conduct church services in the HELP1 shelter -- it may have
brought other individuals, such as choir members, to participate
in the services.

Accordingly, DHS shelters may impose restrictions on speech as long as those restrictions are reasonable and viewpoint neutral.

The undisputed evidence, including the Procedure, the purpose of DHS shelters, and the physical characteristics of the shelters, unequivocally support the conclusion that DHS's shelters are nonpublic fora.  There is no evidence that they have been made generally accessible for all forms of expressive activity.  Indeed, all factors point to a contrary conclusion. First, the Procedure expressly limits access to DHS facilities to authorized visitors.  The Procedure includes a finite list of authorized visitors.  The level and circumstances of access vary for each category of visitors.  For instance, press and media representatives must obtain "prior authorization from DHS' Office of Communications and External Affairs" before visiting DHS shelters.  Elected officials may visit without prior authorization, but are expected to notify DHS prior to their visit "[a]s a matter of courtesy," and may be directed "to a waiting area" if they arrive without prior notification.  With respect to external organizations, the policy provides that

> DHS may authorize particular external organizations
> not described above to have shelter access to provide
> services to residents (on behalf of and/or in
> conjunction with DHS) when DHS determines that such
> organizations have the specific expertise to most
> efficiently assist DHS in carrying out its core
> mission of providing shelter and assisting residents
> in their search for permanent housing.  Facility
> directors, at their discretion, may provide access to

18

> external organizations in order to provide on-site
> services specifically mandated or authorized by
> applicable law and regulations, including
>
> Childcare services,
> After-school programs,
> Medical and mental health services,
> Housing services,
> Job training or employment services,
> Improvements or repair work, etc.

(Emphasis supplied.)  In order to protect the privacy of shelter

residents, the policy instructs that external organizations

"should be granted access to facilities pursuant to contracts,

agreements . . ., or codes of professional responsibility."

Rather than suggesting that shelters are designated public

fora, the Procedure evidences an intent to maintain shelters as

nonpublic fora by carefully regulating access and activities.

The Procedure restricts the access of external organizations to

those that can assist residents in attaining permanent housing,

or can offer services authorized by law, and requires them to

seek permission either from DHS or a facility director prior to

entry.

In addition, neither the purpose of the shelters nor their

physical characteristics are consistent with characterizing DHS

shelters as designated public fora.  The principal function of

DHS shelters is to offer temporary emergency shelter to homeless

families and individuals -- not to serve as a public space for

assembly, debate, or expression.  Consistent with this function,

the common spaces in the shelters "are not designed for private congregate group activities of any sort."  Activities conducted in common space cannot "avoid invading the privacy of" the residents.  In sum, each relevant factor indicates that DHS has not designated its shelters as places for public expression.

The plaintiff maintains, however, that because other religious organizations have conducted worship services in DHS shelters, DHS has established a public forum from which Discovered Being Ministry cannot be excluded.  The plaintiff's argument fails because he presented no evidence to suggest that any religious services have occurred with the authorization of DHS rather than in contravention of its policies.

The plaintiff has presented admissible evidence of at most two occasions on which religious services were conducted in a DHS shelter.[5]  During his deposition, the plaintiff testified that he personally observed religious services being conducted at the LIFE shelter on only one occasion.[6]  Specifically, around

_____

[5] The plaintiff repeatedly alleges that Reverend Hepatite, Donnie McClurkin with perfecting Faith Ministries, Creflo Dollar with Creflo Dollar Ministries, Upper Room Filler Station, and Abundant Life Christian Fellowship each performed religious services at DHS shelters, but, with exceptions noted above, has offered no eyewitness or other admissible evidence of these services.

[6] Plaintiff offered evidence that another pastor performed services at shelters, but that pastor has since retracted her statement.  During discovery the plaintiff produced a letter dated July 3, 2012, from Pastor Joan MacDonald ("MacDonald") of

2007, Caractor saw Donnie McClurkin and Creflo Dollar conduct a
"rap for Jesus" concert.  The relevance of this evidence is
limited, however, because it predates the change in DHS's access
policy.  DHS changed its access policy in 2009.  Unlike its
predecessor, the 2009 Procedure expressly limits access to
authorized visitors and lists the categories of organizations
that are eligible to offer on-site services.

The plaintiff testified at his deposition on May 11, 2012,
that another religious service was conducted after the enactment
of the Procedure.  Carator testified that he witnessed Reverend
Hepatite perform services at the HELP1 shelter in 2010.  This
testimony contradicted his statement at his deposition on April
4, 2012, that he had no recollection of services being performed
at the HELP1 shelter in 2010.  Even if a jury were to conclude
that religious services were performed on two occasions over a
span of four years, once at the LIFE shelter, and once at the

---

Abundant Life Christian Fellowship, which stated that "Abundant
Life Christian Fellowship and its Ministerial Staff conducted
church services and provided counseling to the clients that
resided in the Domestic Violence shelters and Pregnant Teenage
Youth shelters" in Brooklyn and Queens.  On August 13, 2012,
after defense counsel sought to depose MacDonald, MacDonald sent
a letter to defense counsel seeking to retract her previous
letter, explaining that she allowed Caractor and his wife to
write the letter after Caractor assured her that she would not
need to have any further involvement in the litigation, and
explaining that "[i]t has been more than 25 years since our
Ministry has had any involvement with New York City's[]
Shelters."

HELP1 shelter, the plaintiff's evidence is still insufficient as a matter of law to transform homeless shelters into designated public fora.

The defendants have presented evidence that in recent decades the plaintiff is the sole person to have requested permission to conduct religious services in any DHS family shelters, and that request was denied.[7]  Because a public forum is not created through government inaction, the fact that religious services may have taken place twice in DHS shelters in 2007 and 2010 is insufficient to raise a question of fact regarding whether DHS shelters are public fora.

The relevant question remains whether DHS "intentionally open[ed] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802.  DHS, like many government entities, has limited resources and cannot reasonably be expected to patrol shelters to suppress unauthorized expressive activity. If failure to prevent such activity automatically transformed a nonpublic forum into a public one, few nonpublic fora would remain so for long.  Cf. Young v. New York City Transit Auth.,

_____

[7] During his deposition, the plaintiff stated that a case worker named Aaron King ("King") was present at the religious service conducted by Reverend Hepatite at the HELP1 shelter in 2010. The mere presence of King -- who is employed by HELP USA rather than DHS -- at one of the services, is insufficient to raise a genuine dispute over whether DHS has a policy or practice of permitting religious services to be offered in shelters.  King denies that he observed any religious services take place at HELP1.

903 F.2d 146, 161 (2d Cir. 1990) (finding that, assuming panhandling constitutes protected expression, Transit Authority had not created public forum in subways for panhandling); Travis v. Owego-Apalachin School Dist, 927 F.2d 688, 693 (2d Cir. 1991) ("Though occasional prior use might not suffice to establish a designated public forum open to all, such use will result in a forum designated for the limited category exemplified by the prior permitted use (emphasis supplied)).

Finally, DHS's Procedure reflects a clear intent on the part of DHS to carefully circumscribe the categories of speakers that have access to DHS facilities.  Courts "will not find that a public forum has been created in the face of clear evidence of contrary intent."  Huminiski, 296 F.3d at 90 (citation omitted). In light of this record, DHS shelters cannot be properly classified as designated public fora.

Having determined as a matter of law that DHS shelters are nonpublic fora, the next inquiry is whether DHS's restriction on speakers is reasonable or viewpoint neutral.  The reasonableness of a restriction is assessed in light of the purpose of the forum and "all the surrounding circumstances." Byrne v. Rutledge, 623 F.3d 46, 59 (2d Cir. 2010) (citation omitted). "[T]o survive First Amendment scrutiny the restriction need not be the most reasonable or the only reasonable limitation imaginable." Id. (citation omitted).  It must, however, serve a

legitimate government interest.  Id. at 59-60.  In addition, the
restriction must be viewpoint neutral.  In other words, it must
not "suppress expression merely because [the government] opposes
the speaker's view."  Cornelius, 473 U.S. at 800 (citation
omitted).

     DHS's decision to limit access to external organizations
that either assist in providing shelter, aid shelter residents
to find permanent housing, or provide services mandated or
authorized by law -- a restriction which consequently excludes
religious organizations -- is both reasonable and viewpoint
neutral.  It is beyond peradventure that "[t]he necessities of
confining a forum to the limited and legitimate purposes for
which it was created may justify the State in reserving it for
certain groups or for the discussion of certain topics."
Rosenberger v. Rector and Visitors of Univ. of Virginia, 515
U.S. 819, 829 (1995).

     The decision by DHS to limit access to DHS shelters serves
several legitimate interests.  The common space in DHS shelters
is limited.  Moreover, as the Procedure indicates, DHS makes an
effort to protect the privacy of its residents.  Even more
significantly, DHS has a legitimate interest in avoiding the
appearance that it endorses religion.[8]  Since DHS shelters are

---

[8] In their motion for summary judgment, the defendants argue that
DHS would violate the Establishment Clause if it permitted

not public fora to which all groups have equal access, a
decision to permit religious organizations to offer worship
services in DHS shelters would have the effect of "favoring
sectarian religious expression."  Capitol Square Review, 515
U.S. at 764 (emphasis omitted).  Worship services, perhaps more
than other forms of religious expression, present particular
Establishment Clause concerns because

> [w]hen worship services are performed in a place, the
> nature of the site changes.  The site is no longer
> simply a room in a [shelter] being used temporarily
> for some activity.  The church has made the [shelter]
> the place for the performance of its rites, and might
> well appear to have established itself there.  The
> place has, at least for a time, become the church.

Bronx Household of Faith, 650 F.3d at 41 (emphasis supplied).
DHS is thus entirely justified in enforcing an access policy
that cautiously avoids creating the perception that DHS favors
particular religious beliefs or religion in general.  See Make
the Road By Walking, 378 F.3d at 148 ("[W]here allowing private
expression in a nonpublic forum may imply government endorsement
of that expression, limiting or excluding speakers may be
reasonable.").

---

worship services to take place in the shelters.  It is
unnecessary to decide whether "use of the [shelters] for worship
services would in fact violate the Establishment Clause."  Bronx
Household of Faith v. Board of Educ. of City of New York, 650
F.3d 30, 40 (2d Cir. 2011).  It is sufficient that DHS "has a
strong basis for concern" that permitting worship services in
shelters would violate the Establishment Clause.  Id.

DHS's restriction is also viewpoint neutral.  DHS limits access to its shelters to those external organizations that offer services that relate to DHS's mission.  Caractor does not argue that the religious services offered by Discovered Being Ministry constitute such services.  Thus, this is not a case in which the government is seeking to prohibit the expression of a perspective on an otherwise "includible" subject.  See Byrne, 623 F.3d at 55.  In sum, the plaintiff has failed to raise a genuine issue of material fact with respect to whether DHS violated his right to free speech by denying the request made on behalf of the Ministry to offer religious services in the HELP1 shelter.

2. Free Exercise

The plaintiff claims that the denial of his request for the Ministry to provide church services inside a shelter also violated his free exercise rights.  Before addressing this claim, it is appropriate to clarify what is and what is not implicated by this case.

The only action taken by DHS of which the plaintiff complains is its rejection of plaintiff's request, as the Presiding Prelate of a religious organization, to offer worship services inside the HELP1 shelter.  The rejection was expressly based on DHS' neutral, generally applicable access policy.  The Procedure does not target religious practice for exclusion; it

merely excludes services that do not relate to DHS's mission. Worship services are just one of many activities that could not be classified as activities relating to DHS's mission.  Thus, among other things, this action does not address the rights of residents to engage in individual prayer within DHS shelters.[9]

The right of individuals to freely exercise their religion is protected by the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  Const. amend. I.  As mentioned, the First Amendment's protections have been incorporated through the Fourteenth Amendment, and apply to the states.  See Cantwell, 310 U.S. at 303.  The Constitution's free exercise guarantee encompasses two conceptually different freedoms: the "freedom to believe and the freedom to act on one's beliefs."  Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir. 2006) (citation omitted).  While the Constitution's protection of the former is absolute, its protection of the latter is not.  At bottom, "the protections of the Free Exercise

---

[9] On the one hand, like public university students, shelter residents reside in government property, even if on a temporary basis, a factor which, in some cases has called for greater accommodation of an individual's right to the free exercise of religion.  See Brandon v. Board of Ed. of Guiderland Central School Dist., 635 F.2d 971, 977-78 (2d Cir. 1980).  On the other hand, shelter residents, unlike prison inmates and military base residents, can freely leave the facilities and do have access to the "regular religious facilities of the community," making a regulation prohibiting religious activity in the shelters less of an imposition.  Id.

Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." <u>Commack Self-Service Kosher Meats v. Hooker</u>, 680 F.3d 194, 210 (2d Cir. 2012) (citation omitted).

The Free Exercise Clause does not, however, "relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." <u>Emp't Div. v. Smith</u>, 494 U.S. 872, 879 (1990) (citation omitted).  Accordingly, where a law or government regulation "targets a specific religious practice and substantially burdens that practice" it is invalid unless it is narrowly tailored to serve a compelling interest. <u>Tabba v. Chertoff</u>, 509 F.3d 89, 105 (2d Cir. 2007).  When, on the other hand, a neutral law of general applicability incidentally burdens religious practice, the government need only demonstrate a rational basis for the regulation.  <u>Commack Self-Service Kosher Meats</u>, 680 F.3d at 212.

For the reasons already explained, the Procedure is a neutral law of general applicability that only incidentally burdened the Ministry and the plaintiff's performance of religious services through the Ministry.  Again, as described

above, DHS's access policy rationally relates to legitimate
interests of DHS.

The plaintiff argues, however, that even neutral laws of
general applicability must withstand strict scrutiny if the law
substantially burdens religious exercise.  The plaintiff is
wrong.  The statute that the plaintiff cites for the enhanced
standard of scrutiny -- the Religious Freedom Restoration Act of
1993 -- was held unconstitutional as applied to state and local
governments in Boerne v. Flores, 521 U.S. 507 (1997).  Congress'
partial re-codification of that statute in the Religious Land
Use and Institutionalized Persons Act of 2000 has no application
to the present action.[10]  See generally Cutter v. Wilkinson, 544
U.S. 709, 714 (2005).  In sum, the plaintiff has failed to raise
a genuine issue of material fact with respect to whether DHS
violated his free exercise rights.

3. Equal Protection

Finally, the plaintiff claims that the denial of his
request on behalf of the Ministry to offer religious services in

_____

[10] Plaintiff's endorsement of a higher standard of scrutiny could
be construed as an argument that where government regulation
that arguably implicates the Free Exercise Clause also
implicates other constitutional rights -- so called "Hybrid"
claims -- a higher standard of scrutiny should pertain.  This
argument, however, must also be rejected.  As the Second Circuit
has explained, there is "no good reason for the standard of
review to vary simply with the number of constitutional rights
that the plaintiff asserts have been violated."  Leebaert v.
Harrington, 332 F.3d 134, 144 (2d Cir. 2003).

the HELP1 shelter constituted discrimination on the basis of
religious affiliation and accordingly, denied him equal
protection of the laws under the Fourteenth Amendment.
Plaintiff's equal protection claim appears to be based on
plaintiff's allegation that certain religious organizations were
permitted to offer religious services at DHS shelters, while
Discovered Being Ministry was not.

"The Equal Protection Clause of the Fourteenth Amendment is
essentially a direction that all persons similarly situated
should be treated alike." Brown v. City of Syracuse, 673 F.3d
141, 151 (2d Cir. 2012) (citation omitted).  Accordingly, if the
government selectively enforces an otherwise neutral policy
against an individual on the basis of impermissible
considerations, such enforcement can give rise to a violation of
the Equal Protection Clause.  To establish such a claim, the
plaintiff must demonstrate that "(1) the plaintiff, compared
with others similarly situated, was selectively treated; and (2)
that such selective treatment was based on impermissible
considerations such as race, religion, intent to inhibit or
punish the exercise of constitutional rights, or malicious or
bad faith intent to injure a person." Id. at 151-52 (citation
omitted).

The plaintiff has failed to raise a genuine issue of
material fact with respect to whether he was discriminated

against on the basis of his religion.  As explained above, the
plaintiff has failed to offer admissible evidence that DHS
authorized other organizations or individuals to offer religious
services in DHS shelters.  In the absence of such evidence, the
plaintiff cannot demonstrate that DHS treated him differently
than those with whom he is otherwise similarly situated.
Accordingly, his claim of religious discrimination in violation
of the Equal Protection Clause must fail.


CONCLUSION

       The defendants' September 28 motion is granted.  The Clerk
of Court shall enter Judgment for the defendants and close the
case.

Dated:     New York, New York
           June 14, 2013


                                _____
                                         DENISE COTE
                                United States District Judge

```
COPIES MAILED TO:

William B. Caractor
147-41 Hook Crook Boulevard
Apt. # 1F
Rosedale, NY 11422
```